**Case No. 22-55794**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

**PAVEL FUKS,**

*Plaintiff and Appellee*

vs.

**YURI VANETIK,**

*Defendant and Appellant*

_____

APPEAL FROM A DECISION OF THE
UNITED STATES DISTRICT COURT OF THE
CENTRAL DISTRICT OF CALIFORNIA,
Case No. 8:19-cv-01212-FLA-JDE
Fernando L. Aenlle-Rocha, Judge

_____

**APPELLANT'S BRIEF**

_____

John M. Hamilton, SBN 155381
jm_hamilton15@yahoo.com
HAMILTON LAW OFFICES
5757 W. Century Boulevard
Suite 700
Los Angeles, California 90045
Tel: 424-419-4028
Fax: 424-419-4002

Janice R. Mazur, SBN 144611
appealslawyer@aol.com
MAZUR & MAZUR, LLC
13465 Camino Canada
No. 106-103
El Cajon, California 92021
Tel: 800-383-5002
Fax: 888-550-1240

Attorneys for Appellant

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      THE DISTRICT COURT ERRED AS A MATTER OF LAW IN
        CONCLUDING THAT THE PARTIES CREATED AN ENFORCEABLE
        CONTRACT WHICH WAS BREACHED. . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.      The evidence fails to establish the necessary elements of a breach of
                contract claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      The evidence fails to establish the existence of a contract. . . 10

                        a.      The evidence does not adequately identify the parties to
                                the purported contract. . . . . . . . . . . . . . . . . . . . . . . . . 11

                        b.      The evidence fails to establish the parties' mutual
                                consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                        c.      The evidence fails to establish a lawful object to the
                                contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                        d.      The evidence fails to establish that plaintiff paid any
                                consideration for the VIP package. . . . . . . . . . . . . . . . 21

                        e.      If the WhatsApp messages do not constitute a written
                                contract, then, at most, there is only an oral contract
                                which is barred by the two-year statute of limitations. . 22

f.     Even assuming the existence of a written contract, the evidence fails to establish the other required elements of a contract cause of action. . . . . . . . . . . . . . . . . . . . . . . . 22

2.     The evidence fails to establish that plaintiff performed his obligations under the purported contract. . . . . . . . . . . . . . . 23

3.     The evidence fails to establish the defendant's breach. . . . . . 24

4.     The evidence fails to prove that plaintiff was damaged in the amount of $200,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

a.     The evidence fails to show plaintiff incurred any damage because he did not personally pay any money. . . . . . . . 26

b.     Even assuming plaintiff paid the money, the evidence fails to show he was damaged in the amount of $200,000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT VANETIK ENGAGED IN PROMISSORY FRAUD. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.    The evidence is insufficient to support the promissory fraud claim. 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

STATEMENT OF RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

PROOF OF SERVICE BY ELECTRONIC SERVICE. . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**Cases**

*Abrahim & Sons Enterprises v. Equilon Enterprises, LLC* (2002) 292 F.3d 958.  12

*Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*
(1998) 62 Cal.App.4th 348. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400. . . . . . 29

*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199. . . . . . . . . . . . . 9, 15, 16, 20

*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474.  . . . . . . . . . . . . 15

*CB Richard Ellis, Inc. v. Terra Nostra Consultants* (2014) 230 Cal.App.4th 405. 12

*Cisco v. Van Lew* (1943) 60 Cal.App.2d 575. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211. . . . . . . . . . . . . . . . . . . . . . . . 12

*Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173. . . . . . . . . . . . . . . . . . . . 11

*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951. . . . . . . . . . . 29

*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32.  15

*Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562. . . . . . . . . . . . . 12

*Ladas v. California State Auto. Assn*. (1993) 19 Cal.App.4th 761. . . . . . . . . . . . . 15

*Lazar v. Superior Court* (1996) 12 Cal.4th 631. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Long v. Provide Commerce, Inc*. (2016) 245 Cal.App.4th 855.  . . . . . . . . . . . . . . 14

*Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724. . . . . . . 11

*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811. . . . . . . . . . . . . 10, 22

*People v. Pacific Landmark* (2005) 129 Cal.App.4th 1203. . . . . . . . . . . . . . . . 12

*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169. . . . . . . . . . . . . . . . . . . . 27

*Professional Collection Consultants v. Lujan* (2018) 23 Cal.App.5th 685. . . 10, 22

*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396. . . . . . . . . . . . . 9, 15

*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444. . . . . . . . . . . . . . . . . . . 15

*Shivkov v. Artex Risk Solutions, Inc*. (9th Cir. 2020) 974 F.3d 1051. . . . . . . . . . . 9

*U.S. v. Rodriguez-Acosta* (9th Cir. 1997) 124 F.3d 214. . . . . . . . . . . . . . . . . . . 29

*ViChip Corp. v. Lee* (N.D. Cal. 2006) 438 F.Supp.2d 1087. . . . . . . . . . . . . . . . 12

*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793. . . . . . 14, 15, 20

**California Statutes**

Civil Code section 1550. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20
Civil Code section 1558. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Civil Code section 1565. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20
Civil Code section 1580. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20
Civil Code section 1598. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Civil Code sectino 1599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Code of Civil Procedure section 339. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Corporations Code section 17300. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Corporations Code section 17701.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Corporations Code section 17701.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Corporations Code section 17703.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## Federal Statutes

28 USC 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 USC 1332. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1


## Secondary Authority

Restatement 2d Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATEMENT OF JURISDICTION**

This is a diversity action between a citizen of the United States and a citizen of a foreign state. The district court had jurisdiction over the matter pursuant to 28 U.S.C. 1332, subdivision (a)(2). This court has jurisdiction over this appeal pursuant to 28 U.S.C. 1291.

**INTRODUCTION**

Plaintiff and appellee Pavel Fuks is a citizen and resident of Ukraine. (2ER 35-36). Defendant and appellant Yuri Vanetik is a citizen and resident of California. Fuks alleges that he paid Vanetik $200,000 to secure him a VIP events package for Donald Trump's 2017 U.S. Presidential inauguration. Vanetik asserts the payment was not for the inauguration events, but rather was a partial payment for services rendered under an unrelated contract.

After a three day bench trial, the district court found in favor of Fuks on his causes of action for promissory fraud and breach of contract, and awarded him a judgment of $200,000.

Vanetik asserts that the undisputed evidence establishes that no enforceable written contract was ever formed and the elements of the breach of contract cause of action were not met. Alternatively, even if a contract was formed and the elements of the claim were met, the court erred as a matter of law in awarding Fuks the full $200,000 claimed because Vanetik substantially performed and Fuks failed to attend many of the events arranged by Vanetik.

Vanetik further asserts that, assuming a contract was formed at all, the evidence is insufficient to support the district court's finding that at the time he agreed to provide the VIP inauguration package, Vanetik did not intend to perform.

1

## STATEMENT OF THE CASE[1]

Plaintiff and appellee Pavel Fuks ("Fuks") is a citizen and resident of Ukraine. (2ER 35-36). Fuks testified remotely from his home in Ukraine because he is subject to a five-year travel ban to the United States which commenced at the end of 2017. (2ER 36, 81).

Defendant and appellant Yuri Vanetik ("Vanetik") is a resident of California. (3ER 355, 364). He is an attorney admitted to practice in Washington D.C. and Pennsylvania. In addition to practicing law, Vanetik has been director of multiple companies, and has held several political appointments. He also serves as a reservist with the San Bernardino Special Services Bureau. (2ER 135-139). Vanetik was also one of three members of Odyssey Management, LLC ("Odyssey"), a consulting firm with offices in Newport Beach, California. (2ER 41-42, 193-194). Among his other activities and interests, Vanetik has been very active in Republican organizations for over 20 years. (2ER 139).

In early 2016, one Gennady Kernes, the mayor of the city of Karkov in Ukraine, asked Vanetik to fly to Rome to meet him to advise him regarding various legal problems Kernes was enmeshed in domestically and abroad. (2ER 36-37, 139-142).[2] Vanetik went to Rome and met with Kernes, and with Kernes'

---

[1]    "ER" refers to the Appellant's Excerpts of the Record filed concurrently with this brief. "Dkt." refers to the District Court docket. This Statement of the Case is intended to provide an overview of the evidence. Additional detail is provided in the argument portion of this Brief.

[2]    Vanetik described Kernes as a "controversial figure" with an allegedly criminal past, who was the subject of multiple criminal cases pursued by the Ukrainian government, who had had his U.S. visa revoked and who had survived an assassination attempt which left him in a wheelchair. He was seeking Vanetik's help with his immigration issues and to help him call attention to human

long time friend and confidant, Pavel Fuks. At this meeting, Kernes and Fuks indicated that they wanted to hire Vanetik to provide consulting and other services for Kernes. The services would be provided through Odyssey Management, LLC. According to Vanetik, it was agreed that Fuks would be the person responsible for payments related to the Kearns projects. (2ER 89-92, 140-144).

Vanetik testified that there were two agreements related to the Kearns projects. The first was an agreement that he would fly to Rome and provide consultation for a fee of $65,000. (2ER 149). The second was a consulting agreement which he drafted entitled "Odyssey-Pavlov Fuks Consulting Agreement" which detailed the consulting services to be provided by Odyssey Management LLC in exchange for a "true retainer" of $250,000 plus $50,000 per month for six months. (2ER 149-152, 3ER 411-413). This written agreement was admitted as Exhibit 10 at trial and it bore a signature at the bottom next to the type-written name Pavlo Fuks. (3ER 411-413). Although Fuks admitted being at the Rome meeting with Kernes and Vanetik and he admitted that he thereafter communicated with Vanetik regarding the Kernes matters (2ER 36-37, 89-92, 108-109, 3ER 394-397), Fuks denied that he had agreed to pay for the services provided to Kearns and denied that it was his signature on the consulting agreement. (2ER 77, 89).

Odyssey worked on the Kearns project for approximately four months. Odyssey prepared a draft feasibility study which was emailed to a lawyer working for Kearns. Accordingly to Vanetik, Odyssey stopped working on the project after it became less of a priority for Kearns and because Fuks was not accessible and no

---

rights violations perpetrated against Kernes. (2ER 140-143).

payments had been made. (2ER 153-154).

In November 2016, Fuks inquired of Vanetik about the U.S. Presidential inauguration. He said he had friends, Vitaliy Khomutynnik and his wife Svetlana, for whom Fuks wanted to arrange a "VIP" experience. (2ER 158, 3ER 400). According to Vanetik, he responded that he would put together a package of events for the inauguration, but he needed Fuks to start paying his bill (for the Kernes matter). (2ER 158). According to Vanetik, Fuks agreed to pay $200,000 toward the Kernes bill with more the following year. (2ER 159).

According to WhatsApp messages exchanged between Fuks and Vanetik, on November 16, 2016, Vanetik said: "Best VIP 100k per person. 3 days included top briefings ticket to inaugural ball, etc. photo opps most likely. There are levels below that as well." Fuks responded, "I'll take two tickets . . ." (3ER 400).[3]

---

[3] Fuks introduced as Trial Exhibit 1, a series of WhatsApp text messages purportedly exchanged between himself and Vanetik from March 2016 through May 2017. (2ER 38-43, 3ER 379-407). Vanetik objected on foundation and authenticity grounds, contending that the WhatsApp messages were incomplete, out of sequence and, in some cases, modified or fabricated but Exhibit 1 was admitted over his objections. (2ER 43-51, 205-206). Although Vanetik continues to assert that these messages were incomplete, out of sequence and inaccurate, he does not challenge the court's discretionary admission of the messages for purposes of this appeal.

The parties communicated on WhatsApp in both English and Russian. Pages 1-14 of Exhibit 1 (3ER 379-392) include the original language texts. Page 15 is a translation certification. (3ER 393). Pages 16-29 (3ER 394-407) are the messages translated into English. (2ER 49-50). Appellant will refer to the translated portion of Exhibit 1.

Each WhatsApp message on Exhibit 1 is preceded by a date and time of transmission. (2ER 46).

On November 21, 2016, Vanetik emailed an invoice from Odyssey Management, LLC and addressed to BEM Global Corp. in Tortola, British Virgin Islands, to Fuks' coworkers. The invoice described the services provided as "Project Analysis, business plan development, and Due Diligence; legal and accounting management; public relations. * Earned retainer." The amount billed was $200,000. It included instructions to wire the funds to "Odyssey Management LLC." (2ER 57, 75-76, 3ER 408-409). Vanetik testified that this invoice was for work performed on the Kernes matter. (2ER 158-159 ).

On November 22, 2016, BEM Global Corp. wired $200,000 to Odyssey. (3ER 410).

Over the next few weeks, Fuks and Vanetik exchanged various messages about the inauguration events on WhatsApp and through other means of communication. The WhatsApp messages repeatedly reference the fact that they were also communicating by phone, video conferences and in person.[4]

Vanetik regularly updated Fuks with options for new events as he learned of them, and noted on several occasions that events and details were changing. (3ER 400-406).

---

[4] Between November 16, 2016 and January 20, 2017, there are many references to "missing video" "missed audio call", and photo attachments which are not part of the record. (3ER 400-406). There are also numerous references in the messages themselves to other communications separate from the WhatsApp platform. For example, on November 17th: "I will explain when we talk", "call me and I will explain several options" (3ER 400); on November 29, 2016, "There are a few nuances to go over. Let's chat a little later" followed by: "Thanks, I'll wait for a call." (3ER 401); On December 14, 2016, a face-to-face meeting in London (3ER 402); on January 9, 2017, a reference to a cost of "350k" to arrange a meeting with the President-elect, "Same number I shared with you before." (3ER 404).

Vanetik explained to Fuks the rules governing official inaugural events and the fact that foreigners such as Fuks and the Khomutynniks were precluded from purchasing tickets to official inauguration events. (2ER 181)

Odyssey made payments of $40,000 to the Keelen Group and $25,000 to Medowood Management, LLC to assist in the scheduling of inauguration events for Fuks and his guests. (2ER 160, 168, 201).

Prior to Fuks' arrival, Vanetik emailed him an outline of some of the events Fuks and his guests might be able to attend. Vanetik then spoke to Fuks about the program and Fuks did not object. The program which had been arranged included events from January 14th or 15th through January 21, 2017. (2ER 173-174).

Fuks and his friends did not arrive in Washington, DC until the evening of January 19th. (2ER 116, 124, 174-176, 3ER 405-406).

On the evening of the 19th, Fuks and his guests attended the "Texas Black Tie and Boots" event where people from Texas were celebrating Trump's victory. Trump was supposed to attend this event but he didn't. Fuks was dissatisfied with this event because it was outside of Washington D.C., he was not introduced to VIPs there, and Trump did not show up. (2ER 66, 163, 177-178).

Vanetik also arranged for Fuks and his guests to attend, with him, a party at the Trump Hotel on the evening of the 20th of January. Vanetik introduced Vitalliy Khomutynnik to the house minority whip, Kevin McCarthy, and to Ed Royce, who was then chairman of the Foreign Affairs Committee as well as Senator Corey Gardener. Khomutynnik was able to chat with them and take photos. There were also other prominent politicians and famous football players there. President-elect Trump was supposed to attend this event, but he did not appear. (2ER 175-176).

Vanetik also arranged for Fuks and his guests to attend a Montana delegation event at an historic building referred to as the "Carpenter's Union" which overlooked the actual inauguration. The event would include a small group of people and a high ratio of politicians. Vanetik considered the venue to be unique and ideal because it would provide an opportunity to observe the actual swearing-in ceremony with a select group in a pleasant environment, as opposed to the other option which entailed standing outside in the rain in a crowd, and having to use porta-potties. (2ER 66-67, 161-163). Unfortunately, there was a transportation issue and Fuks and his party arrived late to this event. (2ER 67-69).

Fuks and his guests departed from Washington on the morning of January 21st to fly to Aspen for skiing. (2ER 116-117, 175). That day Khomutynnik texted Vanetik "thank you", while Fuks simply texted "we are gone". (2ER 176). Fuks' friends never expressed any dissatisfaction with the program to Vanetik. (2ER 176).

At the end of January, Fuks contacted Vanetik and demanded his money back. (3ER 406-407). According to Vanetik, on two occasions Fuks threatened to shoot Vanetik in the face and "blow him up." (2ER 182-183). Fuks did not recall making any threats against Vanetik but said he may have called him an "asshole." (2ER 117, 121).

Defense witness Sayhan Agaev testified that about two years prior to the trial, he spoke with Fuks by video call twice to try to resolve his dispute with Vanetik. Fuks told him Vanetik was responsible for Fuks' visa problem and that if Vanetik did not "fix it" Fuks would "do him in", which Agaev understood to be a threat against Vanetik's life. Fuks never mentioned to Agaev that he felt Vanetik owed him any money. (3ER 297-299). Fuks denied knowing Agaev. (2ER 118).

In February 2017, Vanetik reported Fuks' threats to the FBI, which then confiscated Vanetik's phone for several weeks. After the phone was returned, Vanetik could no longer access Signal or other apps. (2ER 237-239).

Vanetik testified that he received no compensation from Fuks or any third parties related to the services he provided to Fuks and his guests for inauguration events. (2ER 165).

Fuks filed his Complaint on June 18, 2019. (3ER 362). He alleged causes of action for promissory fraud, intentional misrepresentation, breach of contract, conversion, unjust enrichment and violation of California's Unfair Competition Law (Bus. & Prof. Code section 17200). (3ER 362-378).

On September 23, 2021, plaintiff dismissed the UCL claim. (1ER 5).

A bench trial commenced on September 21, 2021 and concluded on September 23, 2021. On that date, the plaintiff confirmed that he was seeking only compensatory damages of $200,000. (3ER 332).

On November 19, 2021, both parties submitted proposed Findings of Fact and Conclusions of Law. (1ER 5, 3ER 417, Dkt. 96 & 97).

On July 19, 2022, the court issued its own Order Following Bench Trial finding in favor of Fuks on the promissory fraud and breach of contract claims and in favor of Vanetik on all the remaining claims. (1ER 4-22).

Judgment in favor of Fuks in the amount of $200,000 was entered on July 28, 2022. (1ER 2-3).

Vanetik timely filed a Notice of Appeal on August 19, 2022. (3ER 414).

8

## SUMMARY OF ARGUMENT

As a matter of law, the undisputed evidence establishes that no enforceable written contract was ever formed and the elements of the breach of contract cause of action were not met. Specifically, the undisputed evidence establishes that the WhatsApp messages which the court held constituted a "written contract" did not establish the existence of a valid contract, defendant's breach or resulting damages.

Alternatively, even if a contract was formed and the elements of the claim were met, the court erred as a matter of law in awarding Fuks the full $200,000 claimed because Vanetik substantially performed and Fuks failed to attend several of the events arranged by Vanetik.

Finally, assuming a contract was formed at all, the evidence is insufficient to support the district court's finding that at the time he agreed to provide the VIP inauguration package, Vanetik did not intend to perform.

## I.

## THE DISTRICT COURT ERRED AS A MATTER OF LAW IN CONCLUDING THAT THE PARTIES CREATED AN ENFORCEABLE CONTRACT WHICH WAS BREACHED

### A. Standard of Review

Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide. (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407; *Bustamante v. Intuit, Inc.* (2006) 141

9

Cal.App.4th 199, 208). The district court's interpretation and meaning of contract provisions are questions of law reviewed de novo. (*Shivkov v. Artex Risk Solutions, Inc*. (9th Cir. 2020) 974 F.3d 1051, 1058).

Here, the court determined that the WhatsApp text messages between the parties constituted a written contract. (1ER 17). Since the content of the WhatsApp messages are not disputed for purposes of this appeal, the question of whether a contract was formed presents a legal issue to be reviewed de novo.

**B.     The evidence fails to establish the necessary elements of a breach of contract claim**

Under California law, the elements of a cause of action for breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821, accord, *Professional Collection Consultants v. Lujan* (2018) 23 Cal.App.5th 685, 690).

In this case, the district court concluded that Exhibit 1, consisting of the purported WhatsApp text messages between Fuks and Vanetik, constituted an enforceable written contract. As will be shown, even assuming, *arguendo*, that these messages were authentic, the court erred in concluding that they constituted an enforceable written contract between the parties because the messages fail to establish the essential elements of a breach of contract claim.

**1.     The evidence fails to establish the existence of a contract**

The first required element of a breach of contract claim is proof of the existence of a contract. The essential elements necessary to create a contract are: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a

sufficient cause or consideration. (California Civ. Code, § 1550).[5] The WhatsApp messages are legally insufficient to prove these elements, and therefore they fail to prove the existence of a contract.

### a. The evidence does not adequately identify the parties to the purported contract

"It is essential to the validity of a contract, not only that the parties should exist, but that it should be possible to identify them." (Civ. Code, § 1558). Here, the evidence is insufficient to identify exactly who the parties to the purported contract are.

First, although Fuks and Vanetik corresponded and spoke about various inauguration events, it is undisputed that the $200,000 which was wire transferred on November 22, 2016, was transferred from "BEM Global Corp" to "Odyssey Management, LLC". (2ER 59-60, 155, 3ER 410).

Under well-established California law, corporations and LLCs are legal entities separate from their shareholders and members. "Because a corporation is a legal entity *separate from its shareholders* (*Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 729), when a corporation has suffered an injury to its property *the corporation is the party that possesses the right to sue for redress*. (*Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 183 [emph. added; parallel citation omitted]).

---

[5]     Civil Code section 1550 states: "Essential Elements of Contract. It is essential to the existence of a contract that there should be:1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and, 4. A sufficient cause or consideration."

The same is true of an LLC. California Revised Uniform Limited Liability Company Act (Cal. Corp. Code §§ 17701.01§§ *et seq*.) provides: ***(a) A limited liability company is an entity distinct from its members***. (Cal. Corp. Code § 17701.04§§).The purpose of forming this type of business is to ***limit the liability of its members***. (Corp Code § 17101§§; *Abrahim & Sons Enterprises v. Equilon Enterprises, LLC* (2002) 292 F.3d 958, 962). Ordinarily, only the LLC can be held responsible for the entity's debts. Subject to narrow exceptions not applicable here, ***the LLC members are not personally liable for the entity's obligations*** or liabilities and thus enjoy the same "limited liability" as corporate shareholders. (Cal. Corp. Code § 17703.04(a)(2); *CB Richard Ellis, Inc. v. Terra Nostra Consultants* (2014) 230 Cal.App.4th 405, 411; *Kwok v. Transnation Title Ins. Co.* (2009) 170 Cal.App.4th 1562, 1571; *People v. Pacific Landmark* (2005) 129 Cal.App.4th 1203, 1212). Like corporate shareholders, ***members of a limited liability company hold no direct ownership interest in the company's assets.*** (Corp. Code § 17300; *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, 1215, fn. 1). In *Kwok*, at 1570, Division Two of California's Second Appellate District held that appellants, who had been members of a dissolved LLC, ***never held an ownership interest in the property to which the LLC held title***. See also *ViChip Corp. v. Lee* (N.D. Cal. 2006) 438 F.Supp.2d 1087, 1094 [Consulting agreement between corporations, as only named parties to agreement, only bound those corporations under California law, and not their employees, principals, or officers].

Here, although Fuks testified that BEM Global Corp. is "one of my companies" (1RT 38), he provided no evidence at all as to the nature of his relationship to the company. What is apparent from the company's name is that

12

"BEM Global Corp" is a corporation, which, by definition, is owned by its shareholders, not by Pavel Fuks individually. And if the word "Global" in its title means anything, it means that this is likely a large company doing business internationally, rather than a small, closely-held, mom-and-pop type operation.

The undisputed evidence presented at trial as to Odyssey is that it was an LLC with its office in Newport Beach, California. The principles in the company were Vanetik and his two partners and co-members, Eric Rogers and Stewart Weingarten. Odyssey was created to be a consulting company which would do feasibility studies, due diligence, market entry analysis and political advocacy. The company became inactive around the beginning of Covid. (2ER 144-145, 193-194).

Thus, even assuming that Fuks authorized the $200,000 payment and that payment was intended to purchase a VIP inaugural package, this still does not establish that Fuks <u>personally</u> was a party to the contract since it is undisputed that he did not personally pay any consideration for the services or events to be provided under the purported contract and there is no evidence that Fuks had a unity of interest with BEM Global Corp. Nor is there any evidence that Fuks ever reimbursed BEM Global Corp. for the payment.

Conversely, receipt of the $200,000 by <u>Odyssey</u> does not establish that Vanetik, as a member of the LLC, was a party to the contract entered into by Odyssey.

On these facts, neither the WhatsApp messages nor any other evidence presented at trial sufficiently identifies either Fuks or Vanetik as parties to the purported contract.

      **b.**     **The evidence fails to establish the parties' mutual consent**

Even assuming, *arguendo*, that Fuks and Vanetik were the parties to the purported contract, the plaintiff failed to establish that they mutually consented to the same terms.

Under California law, "[t]he consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated by each to the other." (Civ. Code, § 1565). In California, a party's intent to contract is judged objectively, by the party's outward manifestation of consent. The parties' outward manifestations must show that the parties all agreed "upon the same thing in the same sense." (Civ. Code § 1580.) If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation. (Civ.Code §§ 1550, 1565 and 1580; *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811). The requirement of certainty as to the agreement in order that it may be specifically enforced extends not only to its subject matter and purpose, but to the parties, the consideration, and the place and time of performance, where these are essential. (*Cisco v. Van Lew* (1943) 60 Cal.App.2d 575, 581).

These principles apply to electronic communications just as they do to traditional oral or written communications:

> "While [i]nternet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that ' "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." ' " (*Long v. Provide Commerce, Inc*. (2016) 245 Cal.App.4th 855, 862) Mutual assent, or consent, of the parties "is essential to the existence of a contract" (Civ. Code, § 1550; see also Civ. Code, § 1565), and "***[c]onsent is not mutual, unless the parties all agree upon the same thing in the***

14

***same sense***" (Civ. Code, § 1580). (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 460 [emph. added]).

"To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770; *Robinson & Wilson Inc. v. Stone*, *supra,* 35 Cal.App.3d at 407). "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481; Civ.Code, § 1598). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." (Rest.2d Contracts, § 33, subd. (2); accord, *Weddington Productions, Inc. v. Flick, supra*, 60 Cal.App.4th at p. 811.) But "[i]f ... a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract." (*Bustamante v. Intuit, Inc*., *supra,* 141 Cal.App.4th at 209).

It is only on evidence of mutual consent that the law enforces the terms of a contract or gives a remedy for the breach of it; one cannot be made to stand on a contract to which he has never consented. (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 60).

Moreover, ***the failure to reach a meeting of the minds on <u>all material points</u> prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the***

*contract*. (*Bustamante v. Intuit, Inc.*, *supra,* 141 Cal.App.4th at 215; *Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)* (1998) 62 Cal.App.4th 348, 359).

In *Bustamante*, the evidence established that the parties had had many communications regarding a proposed joint venture, however, "the material terms remained uncertain well beyond the time the contract was alleged to have come into existence." (*Bustamante, supra,* 141 Cal.App.4th at 215). Although the venture was first proposed in October 2001, as late as November 2002 the parties had not yet made clear the amount of money which needed to be raised, and well into December they were still discussing the form and amount of compensation to be paid to plaintiff. The court found that even though a joint venture can be created with little formality, the undisputed facts provided no "basis for determining the existence of a breach and for giving an appropriate remedy." (*Id.*, at 215).

The same is true here. The evidence makes clear, (again, assuming for purposes of this appeal only that the WhatsApp messages are accurate), that the parties discussed some sort of "VIP package" related to the 2017 inauguration, but the specifics of what events would be included and the cost for the package was entirely unclear up to almost the date of the actual inauguration.

Specifically, according to the WhatsApp messages, Fuks first stated on November 16, 2016 that he would like to go to the inauguration as a guest with "Vitalik and my wives" [sic]. Vanetik responded, "Let's chat then and I will explain a few things. . . . there are guests that get tickets and guests that get VIP treatment. Regular attendance is a joke. . . . I will explain when we talk." (3ER 400). The next day, November 17th, Vanetik wrote that "time to get tickets is next

five days. Then, they go up." Fuks asked how much they cost, "I'm ready to buy the very best." Vanetik said he would verify the cost and call to explain options. (3ER 400).

On the afternoon of November 18th, Vanetik wrote "Best VIP 100k per person. 3 days includes top briefings ticket to inaugural ball, etc., photo opps most likely." (3ER 400). This vague description did not specify what briefings or which inaugural ball would be included, nor did this message specify whether the "100k per person" was a fee paid to Odyssey to put together a package, or whether this included the price of tickets or donations to various events. Fuks responded "I'll take two tickets". (3ER 400).

With respect to these early communications, it is important to note that they occurred within a very short time after the surprise result of the November 8, 2016 Presidential election.[6] Because Trump's victory was so unexpected, many of the inauguration-related events which would ultimately take place had not yet been planned during the early discussions between Fuks and Vanetik. This point was made abundantly clear in their subsequent conversations, in which Vanetik continuously presented new event options, additional information regarding who

_____

[6] According to a Pew Research article published on November 9, 2016, one day after the election, "[t]he results of Tuesday's presidential election came as a surprise to nearly everyone who had been following the national and state election polling, which consistently projected Hillary Clinton as defeating Donald Trump. Relying largely on opinion polls, election forecasters put Clinton's chance of winning at anywhere from 70% to as high as 99%, and pegged her as the heavy favorite to win a number of states such as Pennsylvania and Wisconsin that in the end were taken by Trump." (pewresearch.org/fact-tank/2016/11/09/why-2016-election-polls-missed-their-mark/).

would attend various events, and what it would cost to secure Fuks and his guests tickets or invitations.

For example, on November 24th, a week after Fuks said he wanted to buy a package, there were still no details regarding what the package would include. Vanetik wrote, "Should have some type of schedule next week. We are all waiting for details." (3ER 401).

Five days after that, Vanetik wrote that he had "what seems to be the final layout. There are a few 'nuances' to go over. Let's chat a little later." (3ER 401). On the 30th he wrote identifying a number of events, stating, "this is the VIP package that we bought. There are corp VIP packages as well. I will review everything tonight and will connect with your tomorrow morning or this evening. (3ER 401).

As of November 30th, almost two weeks after the original discussion, neither the price of the package nor the type of access which could be purchased, was clear. Vanetik wrote: "You obviously get more with more money–but I think a million may be wasteful. If your goal is to have a nice time and get good pics this is the range. Rnc [sic] and NRCC will not have priority with Trump." (3ER 402).

On December 15th Vanetik recommended an event on the 17th [of January] for "22k per person" and said that "to have a high probability of a photo, we are looking at additional 350k. Less may work, but I am told this is the right figure. If this is what you want to do, we can try to negotiate." (3ER 403).

On January 9th, the events and costs were still unclear. Vanetik suggested a January 20th breakfast with Senators for $25,000 per person and an event on the 17th with Ed Royce, Chairman of the International Affairs in Congress for $20,000 per person. He also suggested New York GOP events at $35,000 per person on the

18th and 19th which "may be a good venue to connect with Trump." (3ER 404). He also stated "there are may be options, but these stand out. . .." and it would be an additional $350k to meet the president-elect. "Same number I had shared with you before. It may be a bit more or less depending on how it is negotiated. *As I mentioned, things are somewhat chaotic and are changing daily*. You need to be prepared to spend money to get access at events like this." (3ER 404 [emph. added]).

On January 9th, Vanetik advised, "Only American citizens can buy passes to inauguration or any related events." (3ER 404).

On January 12th Vanetik advised Fuks to plan on arriving no later than the morning of the18th, but said it would be better to come on the evening of the 16th. He described and attached an invitation to attend an "inaugural gala" at the New Zealand Embassy on the evening of January 17th, which would be attended by members of Congress, the incoming Administration, political VIPS and foreign ambassadors. "This event to celebrate the new administration will be one of the best of the week." (3ER 404).

On January 13th Vanetik advised, "As I had mentioned before, there are tons of changes to the program and huge amount of money coming in for the events." (3ER 404).

On January 17th at 7:47 a.m., Vanetik wrote, "There is a problem with the dinner. Trying to fix it. . .". Then, at 4:40 p.m, "We got fucked on the dinner. I am working on fixing it. I hate this Inauguration. It is nothing but headaches" (3ER 405).

There is no evidence that Fuks ever objected to the many updates, new options and changes referenced by Vanetik. It is apparent that he understood that

the inauguration event planning was a fluid situation that was changing day-by-day.

Based on this and other evidence, it is also apparent that although there was a general agreement that some sort of event package could be arranged, "***the material terms remained uncertain well beyond the time the contract was alleged to have come into existence***." (*Bustamante, supra,* 141 Cal.App.4th at 215). ***There was never a meeting of the minds as to exactly what the package would include, or even how much it would cost***. And even assuming the parties agreed as to <u>some</u> terms, that evidence is insufficient to establish the formation of a contract. The failure to reach a meeting of the minds on <u>all material points</u> prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract. (*Bustamante, supra,* 141 Cal.App.4th at 215; *Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.), supra,* 62 Cal.App.4th at 359).

On this record, there plainly is no "certainty of terms", no "meeting of the minds", no "manifestation of assent to the same thing by both parties", no "mutual consent to contract" and thus, ***no contract formation***. (Civ.Code §§ 1550, 1565 and 1580; *Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at 811).

### c. The evidence fails to establish a lawful object to the contract

Under California law, "where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599).

Here, the unrefuted evidence suggests that it is illegal for a foreign national to purchase tickets to top inauguration events, although they can attend such events as guests. (2ER 169, 3ER 404). To the extent that the evidence suggests that Vanetik ever promised that the "VIP package" would include purchased tickets to such inauguration events, that promise is void and does not create an enforceable contract.

### d. The evidence fails to establish that plaintiff paid any consideration for the VIP package

As is discussed in section I(B)(1)(a) above, it is undisputed that the $200,000 which was paid, purportedly for the VIP inauguration package, was not paid by Fuks himself, but rather, was paid by BEM Global Corp. In addition, it is undisputed that those funds were not paid to Vanetik, but rather were paid to Odyssey Management, LLC. (2ER 59-60, 155, 3ER 410). Vanetik testified that he never personally received any money related to the inauguration events package. (2ER 165). For the reasons explained above, under California law, corporations and LLCs are separate legal entities from their shareholders and members, the assets of the entities are not assets of the individual shareholders and members, nor are members liable for the debts of an LLC. Accordingly, as a matter of law, plaintiff has failed to prove that any consideration was exchanged between himself and Vanetik related to the VIP inauguration package. Therefore, even assuming the $200,000 was paid for the inauguration package, there is no evidence that Fuks paid any consideration to Vanetik for the purported contract.

**e.** **If the WhatsApp messages do not constitute a written contract, then, at most, there is only an oral contract which is barred by the two-year statute of limitations**

For all the foregoing reasons, the court erred, as a matter of law, in concluding that the WhatsApp messages constituted an enforceable <u>written</u> contract because those messages fail to establish the elements necessary for a breach of contract claim.

To the extent that it can be argued that the parties' oral communications created an enforceable contract, then the claim is barred by the applicable two year statute of limitations for oral contracts. (Code of Civ. Proc. §339).[7] Assuming, *arguendo,* that there was an enforceable oral contract, and a breach of that contract in January 2017, the statute of limitations expired in January 2019. This action was not filed until June 2019 and is therefore untimely. (3ER 362).

**f.** **Even assuming the existence of a written contract, the evidence fails to establish the other required elements of a contract cause of action**

Once again, under California law, the elements of a cause of action for breach of contract are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman, supra,* 51 Cal.4th 811, 821, accord, *Professional Collection Consultants v. Lujan, supra,* 23 Cal.App.5th 685, 690). For all the reasons stated above, the evidence fails, as a matter of law, to establish that the WhatsApp messages constituted a valid,

---

[7] Civil Code section 339 provides: "Within two years: 1. An action upon a contract, obligation or liability not founded upon an instrument of writing . . .".

22

enforceable written contract.

But even assuming that the first element of a breach of contract claim (the existence of a contract), was proved, the claim still fails because Fuks failed to prove the <u>other</u> required elements of a breach of contract cause of action. Specifically, he failed to show he performed, he failed to show Vanetik breached, and he failed to prove resulting damages.

## 2. The evidence fails to establish that plaintiff performed his obligations under the purported contract

Assuming the existence of a contract, the breach of contract claim fails because the plaintiff failed to perform his own obligations under that contract. In addition to paying for the services to be provided, Fuks also had an obligation <u>to show up</u> for the events which made up the VIP package. He did not.

Specifically, Vanetik had arranged a number of events scheduled to take place between January 14th or 15th and January 21st. (3ER 173-174). For example, on January 9th, Vanetik recommended an event scheduled for January 17th. (3ER 404). On January 12th, Vanetik recommended that Fuks arrive on January 16th. (3ER 404). On January 13th Vanetik <u>provided Fuks with invitations</u> to an Inaugural Gala to be hosted at the New Zealand Embassy on January 17th, which Vanetik expected to be attended by members of Congress, incoming Administration personnel, political VIPs and foreign ambassadors. This was an event he anticipated would be "one of the best of the week." (3ER 404).

However, for unexplained reasons, Fuks and his guests did not arrive in Washington D.C. until the afternoon of January 19th, one day before the inauguration and they left on the morning of the 21st to go skiing in Aspen. (2ER 63, 116-117, 124, 174-176, 3ER 405-406). They therefore missed the earlier

scheduled events and another event that was scheduled for the morning of the 21st.

Since Fuks was not in Washington to attend a number of the events which were included in his package, he failed to perform his obligations under the contract.

### 3. The evidence fails to establish the defendant's breach

The third required element of a breach of contract claim is defendant's breach. Here, even assuming, *arguendo*, that a written contract was created, the evidence failed to establish that Vanetik breached it.

First, as is discussed above, to the extent that there was ever a contract, it was between BEM Global Corp and Odyssey Management, LLC, not between Fuks and Vanetik. (2ER 59-60, 155, 3ER 410).

Further, even assuming that the purported contract was with Vanetik personally, the evidence fails to establish a breach of that contract. As is discussed above, the terms of the contract, and specifically, what exactly the "VIP package" would entail, were, at best, very vague and constantly changing as Vanetik obtained more information regarding various events which were being organized in the hectic weeks following the surprise election result. Vanetik repeatedly advised Fuks that his and/or his friends' attendance at different events might be arranged, usually for a large additional fee; he repeatedly referenced discussing "options", noting on November 24th, there were still no details regarding what the package would include. Vanetik wrote, "Should have some type of schedule next week. We are all waiting for details." (3ER 401).

Five days after that, Vanetik wrote the he had "what seems to be the final layout. There are a few 'nuances' to go over". (3ER 401). On November 30th,

24

Vanetik was still trying to discern if Fuks' "goal" was to just "have a nice time and get good pics" or to have actual access to Trump or other persons of importance in the incoming Administration, which would be much more expensive. (3ER 402).

On December 15th Vanetik recommended an event on the 17th [of January] for "22k per person" and said that "to have a high probability of a photo, we are looking at additional 350k. Less may work, but I am told this is the right figure. If this is what you want to do, we can try to negotiate. (3ER 403). On January 9th he re-advised Fuks that "things are somewhat chaotic and are changing daily. You need to be prepared to spend money to get access at events like this." (3ER 404). On January 13th Vanetik advised, "there are tons of changes to the program and huge amount of money coming in for the events." (3ER 404). There is no evidence that Fuks ever objected to any of this evolving information.

Far from establishing a breach of contract, these communications disclose that Vanetik was working hard throughout the month between the election and the inauguration to try to identify, navigate and negotiate the details of many events which Fuks and his friends could potentially attend, including information regarding who else would attend, cost, photo opportunities, and opportunities for access to high-level politicians and Administration members, including but not limited to the President-elect.

On these facts, the court's conclusion that the failure to provide specific tickets to specific events, constituted a breach of the agreement, is simply unsupported by the evidence.

4.      **The evidence fails to prove that plaintiff was damaged in the amount of $200,000**

The fourth required element of a breach of contract claim is resulting damage to the plaintiff.

a.      **The evidence fails to show plaintiff incurred any damage because he did not personally pay any money**

As is set forth above, there is no evidence that Fuks paid any money whatsoever for an inauguration package. The $200,000 which he claims was payment for the inauguration package was paid by a corporate entity. (3ER 410). No evidence was presented to establish Fuks' interest in this corporation, nor was any evidence provided to show that Fuks ever reimbursed the company for the payment. On this ground alone, Fuks' failed to prove any damage, and his breach of contract claim fails as a matter of law.

b.      **Even assuming plaintiff paid the money, the evidence fails to show he was damaged in the amount of $200,000**

Moreover, even if it is assumed, *arguendo*, that Fuks paid $200,000 for an inauguration package, the evidence falls far short of demonstrating that he was damaged in the full amount of $200,000.

As is discussed above, the exact terms of the purported contract were vague at best. Fuks indicated he wanted to purchase a "VIP package" but what constitutes a "VIP package" is utterly subjective.

Even assuming that Fuks was ultimately dissatisfied with the events package provided, this does not establish that the contract was fully breached. To the contrary, the undisputed evidence establishes that the contract was at least partially, if not substantially performed.

26

"Substantial performance is sufficient, and justifies an action on the contract, although the other party is entitled to a reduction in the amount called for by the contract, to compensate for the defects." (*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 186-187).

Here, Vanetik did provide access to events, including "VIP" events. For example, Vanetik arranged for Fuks and his guests to attend the "Texas Black Tie and Boots" ball, a "big deal" event which Trump was supposed to attend. Fuks was dissatisfied with this event, however, because it was outside of Washington D.C., he was not introduced to VIPs there, and Trump did not show up.[8] (2ER 66, 163, 177-178).

Vanetik also arranged for Fuks and his guests to attend a party at the Trump Hotel on the evening of the 20th of January. Vanetik also attended this event and he introduced Vitalliy Khomutynnik to the house minority whip, Kevin McCarthy, and to Ed Royce, who was then chairman of the Foreign Affairs Committee as well as to Senator Cory Gardener. Khomutynnik was able to chat with them and take photos. There were also other prominent politicians and famous football players there. President-elect Trump was supposed to attend this event, but he did not appear. (2ER 175-176).

Vanetik also arranged for Fuks and his guests to attend a Montana delegation event at an historic building (referred to as the "Carpenter's Union") which overlooked the actual inauguration. The event would include a small group of people and a high ratio of politicians. Vanetik considered the venue to be unique and ideal because it would provide an opportunity to observe the actual

---

[8]     Obviously Vanetik had no control over whether Trump actually attended events where he was expected.

27

swearing-in ceremony with a select group in a pleasant environment, as opposed to the other option which entailed standing outside in the rain in a crowd. (2ER 58-60). Unfortunately, there was a transportation issue and Fuks and his party arrived late to the event. (2ER 66-69, 161-163).

Moreover, as is discussed above, Vanetik also arranged a number of other events scheduled to take place between January 14th or 15th and January 21st. (2ER 173-174). On January 13th he provided Fuks with invitations to an Inaugural Gala to be hosted at the New Zealand Embassy on January 17th, which Vanetik expected to be attended by member of Congress, incoming Administration personnel, political VIPs and foreign ambassadors, an event he anticipated would be "one of the best of the week." (3ER 404). But Fuks and his guests did not arrive in Washington until the afternoon of the 19th and they left on the morning of the 21st to go skiing in Aspen, causing them to miss several of the scheduled events. (2ER 116, 124, 174-176, 3ER 405-406).

On these facts, even assuming, *arguendo*, that the "VIP package" was less than what was agreed to, the contract was at least partially performed and Fuks himself is responsible for not attending some events which had been arranged. Vanetik should not be liable for Fuks' own failure to attend the full program. Accordingly, the trial court erred as a matter of law in awarding him the entire $200,000 purportedly paid for the package.

28

## II.

## THE DISTRICT COURT ERRED IN CONCLUDING THAT
## VANETIK ENGAGED IN PROMISSORY FRAUD

### A.     Standard of Review

On a challenge to the sufficiency of the evidence, the standard of review is whether there is substantial evidence to support the conviction." (*U.S. v. Rodriguez-Acosta* (9th Cir. 1997) 124 F.3d 214).

### B.     The evidence is insufficient to support the promissory fraud claim

In a promissory fraud action, "the essence of the fraud is the existence of an intent at the time of the promise not to perform it." *(Building Permit Consultants, Inc. v. Mazur* (2004) 122 Cal.App.4th 1400, 1414.) Therefore, the falsity of the promise and the knowledge of that falsity (scienter) are interconnected. A promise is only false if the promisor did not intend to perform the promise when it was made. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1061-1062). "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an ' "intent to ... induce reliance" ' on it." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 976, 64.)

Here, the district court found that Vanetik promised to provide plaintiff a "VIP" inauguration package for two people, that at the time he made that promise, he did not intend to perform it and that plaintiff lost $200,000 in reliance on "Defendant's false promises." (1ER 14-15). But this finding is inconsistent with the court's express finding, made in connection with the intentional misrepresentation cause of action, that Vanetik did <u>not</u> make an actionable misrepresentation of a past or existing fact. (1ER 16).

29

Moreover, even if these two findings are not fatally inconsistent, the evidence is still insufficient to support the court's finding that Vanetik <u>did not intend to provide the VIP package</u>. As is set forth in detail above, even assuming that the package provided did not fully comport with plaintiff's understanding of what would be included, the record firmly establishes Vanetik's extensive efforts to deliver a VIP package.

The undisputed record establishes that Vanetik was in frequent communication with Fuks for the nearly month-long period between his initial inquiry about a VIP package and the inauguration. Throughout this period, new events were being scheduled in response to Trump's surprise victory. Vanetik was clearly working to gather information about these events as it became available, including who would attend, whether and under what circumstances foreign nationals could attend, and what the cost for tickets or invitations might be. He was consistently passing this information on to Fuks. (3ER 400-406). Over these weeks, Vanetik recommended multiple events, some of which would have provided access to the President-elect or other high-level people, but the cost for such access was high. Therefore, Vanetik also tried to determine what sort of experience Fuks and his guests wanted, and what they were willing or able to pay. (3ER 402-404). The record also makes it clear that Vanetik did successfully arrange a number of events, some of which Fuks and his guests attended, and some of which they did not attend because they arrived in Washington late and left early. (2ER 66-67, 116-117, 161-163, 175-178). On these facts, it can hardly be said that Vanetik did not make a significant effort to perform.

Finally, in a footnote, the court suggests that Vanetik may have falsely offered a VIP inauguration experience to induce plaintiff to pay Odyssey for

consulting services which Vanetik believed he owed for the Kernes project. (1ER 15). But this rationale is flawed. First, Vanetik candidly stated in his testimony that he told Fuks he could arrange an inauguration package, but "with the caveat that . . . you need to start paying your bill." (2ER 158). Thus, there was nothing false or deceptive about this statement. It was an express condition precedent.

Moreover, it is undisputed that the $200,000 was paid on November 22, 2016, just a few days after Fuks' initial inquiry. (3ER 410). Had it been Vanetik's intention to induce Fuks to pay, and then not perform, Vanetik would not have made any effort regarding the inauguration package once those funds were received. But that is not what happened. Instead, the undisputed record establishes that after receipt of the funds, Vanetik worked for weeks to put together the package. If the delivered package fell short of what Fuks thought had been promised, that goes to the breach of contract cause of action (which fails for the independent reasons explained above). But whether or not the package was to the satisfaction of Fuks is irrelevant to the different question posed by the promissory fraud cause of action; the crucial issue for that claim is not whether Vanetik fully performed, but rather, whether Vanetik ever intended to perform. The record unequivocally establishes that Vanetik went to great effort to provide a VIP program. Whether or not the ultimate performance met Fuks' expectations, clearly Vanetik put significant effort into performing, and the court's finding that he never intended to perform at all is unsupported, and in fact, refuted by the record.

31

## CONCLUSION

For all the reasons set forth above, the trial court's conclusions that the WhatsApp messages constitute an enforceable written contract between Fuks and Vanetik, and that Vanetik breached that contract, fail as a matter of law. Alternatively, even if those conclusions are supported by the record, the amount of damages awarded is clearly not supported, since Vanetik at least partially performed and Fuks failed to attend a number of events which had been arranged.

The record also refutes the court's findings as to the promissory fraud claim, that Vanetik never intended to perform and that he falsely promised to do so to induce Fuks to pay money owed on the Kernes matter. The undisputed evidence establishes that Vanetik worked for nearly a month to secure various VIP events after the $200,000 had already been received. If he never intended to perform, he would not have done so after payment of the funds.

For all these reasons, this court is respectfully requested to reverse the judgment.

Respectfully submitted,

Dated: December 29, 2022         HAMILTON LAW OFFICES
John M. Hamilton

MAZUR & MAZUR, LLC

By: */s/ Janice R. Mazur*
    Janice R. Mazur

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule, Rule 28-2.6, appellant states that there are no pending related cases.

Dated: December 29, 2022                    MAZUR & MAZUR, LLC


By: __/s/Janice R. Mazur__
     Janice R. Mazur, Attorneys
     for appellant Yuri Vanetik

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure, Rule 32(a)(7)(c), and Ninth Circuit Rule, Rule 32-1, I certify that the attached brief is proportionally spaced with a type-face equivalent to Times New Roman 14 points and contains 8948 words.

Dated: December 29, 2022           MAZUR & MAZUR, LLC

By: __/s/*Janice R. Mazur*__
Janice R. Mazur, Attorneys
for appellant Yuri Vanetik

**PROOF OF SERVICE BY ELECTRONIC SERVICE**

I am employed in the State of California, County of San Diego. I am over the age of eighteen and not a party to this action. My business address is 13465 Camino Canada, No. 106-103, El Cajon, CA 92021.

I declare on December 29, 2022, I electronically served a document entitled: **APPELLANT'S BRIEF** on the following entities through the court's electronic filing system:

Joseph R. Ashby
ASHBY LAW FIRM P.C.
Jospeh@ashbylawfirm.com

John M. Hamilton
HAMILTON LAW OFFICES
jm_hamilton15@yahoo.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Whitefish, Montana.

DATED: December 29, 2022          _____/s/ Janice R. Mazur_____
                                                            JANICE R. MAZUR